IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

CLAYTON SMITH, ET AL.           §
                                §
v.                              §  CIVIL ACTION NO. 4:09-CV-658-Y
                                §
TARRANT COUNTY                  §
COLLEGE DISTRICT, ET AL.        §

OPINION AND ORDER

This case was tried to the Court on January 13 through 15, 2010.  At the conclusion of the trial, rather than hear oral arguments, the Court ordered the parties to submit their final arguments by way of briefs.  Those briefs have been received and, after considering them, the Court enters the following opinion and order.

I.  Background

Plaintiffs Clayton Smith and John Schwertz Jr. are members of Students for Concealed Carry on Campus ("SCCC"), a national organization created in the wake of the shootings at Virginia Tech.  (Tr. Trans. Vol. I. at 102, 136.)  SCCC seeks generally to inform the public about the status of the law on carrying concealed firearms.  More specifically, SCCC seeks to have state and college authorities allow students who are licensed to carry a concealed firearm to do so on college campuses.  (Pl.'s Tr. Ex. 27, p.2.)  SCCC's members advocate for the repeal or amendment of laws and college rules and regulations that are contrary to this goal.  As part of this advocacy, SCCC members engage in "empty-holster protests."  (Id.)  In an empty-holster protest, SCCC members wear empty holsters during their normal campus activities to symbolize the fact that they are unarmed and potentially defenseless against a gunman such as the one

at Virginia Tech.  (*Id.*; Tr. Trans. Vol. I. at 102.)

During the spring semester of 2009, plaintiff Smith became
SCCC's "campus leader" for TCC's northeast campus. (Tr. Trans. Vol.
I. at 105.)  In that role, Smith assisted with organizing an empty-
holster protest to be conducted on the northeast campus in April
2009 in conjunction with SCCC protests to be held on several other
college campuses across the nation.  (*Id.* at 105-06.)  Smith and
Schwertz each planned to wear an empty holster and a t-shirt bearing
the SCCC logo--a mortarboard atop a revolver--and hand out leaflets
detailing SCCC's viewpoints in between classes. (*Id.* at 106-07,
141-42.)

This was not SCCC's first attempt at an empty-holster protest
on TCC's campuses. In the spring of 2008, another SCCC member, Brett
Poulos, had requested that SCCC members be allowed to wear empty
holsters on TCC's campuses as part of a protest.  TCC informed
Poulos that empty holsters would not be allowed on campus.

Prior to the April 2009 protest, Smith sent an email to certain
TCC officials notifying them of his intended protest on the north-
east campus.  Magdalena de la Teja, TCC's vice president for student
development, and Paula Vastine, TCC's director of student develop-
ment services, each responded to Smith's email, informing Smith that
SCCC members would not be allowed to wear empty holsters on campus
and that, per TCC policy, SCCC could not engage students and hand
out leaflets throughout the campus, but instead could only pass out
fliers and speak to students regarding SCCC's views in the campus's
"free speech zone." (Pl.'s Tr. Ex.27, p. A224-25.)  Vastine and

de la Teja also informed Smith that he would have to complete a request to use the free-speech zone at least twenty-four hours in advance of the protest. (*Id.*) Smith chose not to apply for use of the free-speech zone. (Tr. Trans. Vol. I, p. 107.) And, concerned that he might be deemed in violation of TCC policy, he chose not to have the protest at all. (*Id.* at 108.)

In October 2009, SCCC announced that it planned to conduct empty-holster protests on several college campuses in November 2009. (*Id.* at 109.) Smith and Schwertz intended to participate in the protest on TCC's northeast campus, so by email Smith notified TCC's interim chancellor, Dr. Erma Hadley, of the protest. (*Id.* at 110, 143; Pl.'s Tr. Ex. 31, p.4.) As part of the notice, Smith inquired of Hadley whether TCC's policies had changed since his attempt at holding a protest in the spring. (Pl.'s Tr. Ex.31, p.4.) Hadley responded by informing Smith that each TCC campus has "specific requirements for those who wish to protest on campus" without addressing whether the policies that limited the spring protest remained in place. (*Id.*) Smith and Schwertz took Hadley's response as indicating that the same policies that worked to prevent protestors from wearing empty holsters on campus and from engaging in speech activities outside of the campus free-speech zone remained in place. (Tr. Trans. Vol. I, at 111.)

Smith and Schwertz then filed this lawsuit under 42 U.S.C. § 1983 on November 3, 2009, against TCC and Hadley in her official capacity alleging that TCC's rules and regulations regarding speech are unconstitutional on their faces and as applied to them and

seeking declaratory and injunctive relief (doc. #1). According to Smith and Schwertz, the school's rules and regulations impermissibly deprived them of their right to engage in speech by denying them the ability to wear empty holsters on campus and by restricting their other efforts--handing out leaflets and engaging students in conversation--to a designated free-speech zone. Additionally, Smith and Schwertz allege that TCC's requirement that students apply for use of the free-speech zone twenty-four hours in advance of their intended speech activity is an impermissible prior restraint on speech.

Smith and Schwertz filed a motion for a temporary restraining order to allow them to conduct a protest during November 2009 (doc. #10). This Court granted that motion in part (doc. #14). As for the free-speech zone and the permit system, the Court concluded that it amounted to an impermissible prior restraint because the relevant rules and regulations granted too much discretion to the officials charged with deciding whether to grant a request to use the zone. Further, the Court concluded that by employing a permit system that allowed access only to a designated free-speech zone, TCC was denying Smith and Schwertz access to various areas that are tradi-tionally public forums, such as streets, sidewalks, and open common areas. But because classrooms are not regarded as public forums, and because, as a result, speech in classrooms may be subjected to greater regulation, the Court denied Smith and Schwertz's motion for a temporary restraining order to the extent that it requested that they be allowed to wear empty holsters in classrooms.

4

TCC and Hadley then filed motions to dismiss, arguing that Smith and Schwertz never applied for a permit to use the free-speech zone and, therefore, Smith and Schwertz's complaint did not present a justiciable controversy. The Court denied the motion, noting that a justiciable injury is suffered when a regulation on speech has the effect of chilling speech, *see Meese v. Keene*, 481 U.S. 465, 473 (1987), and that facial challenges are allowed to a speech regulation that incorporates a permit or licensing system because the mere existence of excessive discretion to issue a permit in such a system is unconstitutional. *See Beckerman v. Tupelo*, 664 F.2d 502, 506 (former 5th Cir. 1981). Moreover, a party need not expose himself to punishment under a speech regulation in order to challenge it; rather, a party who has reached the point of needing a permit to engage in speech has standing to challenge the permit scheme. *See Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *Basiardanes v. Galveston*, 682 F.2d 1203, 1218 n.17 (5th Cir. 1982) (collecting cases).

In apparent response to the temporary restraining order and denial of the motions to dismiss, TCC and its officials undertook a series of revisions to the student handbook and TCC's policy and regulations manual ("the PRM"). These revisions dispensed with the permit system and the free-speech zone. Smith and Schwertz filed an amended complaint alleging that the revised handbook and PRM continue to infringe their First Amendment rights. Smith and Schwertz also argue that the revisions were adopted contrary to Texas law and TCC's internal procedures.

5

II. Legal Discussion

    A. Article III Case or Controversy

    Before turning to the merits of the challenges made by Smith and Schwertz, the Court must first address which of those challenges it has jurisdiction to entertain.  A federal court must assure itself of its jurisdiction over a case before presiding over it, even if the issue of subject-matter jurisdiction is not raised by the parties.  *See Save the Bay, Inc. v. U.S. Army*, 639 F.2d 1100, 1102 (5th Cir. 1981).  "Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984).  Several doctrines have developed to "elaborate" the case-or- controversy requirement, including standing, ripeness, mootness, and avoidance of political questions.  *Id.*

    Under Article III, the plaintiff before a federal court must have standing to pursue his claims in order for those claims to fall within the court's subject-matter jurisdiction.  *See Massachusetts v. E.P.A.*, 549 U.S. 497, 516 (2007) (stating that the case-or-controversy requirement of Article III "confine[s] the business of federal courts"); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (stating that "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III").

    One element of "the irreducible constitutional minimum of standing" is that the plaintiff must have suffered an "injury in fact."  *See Lujan*, 504 U.S. at 560.  An injury in fact is "an

invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not 'conjectural' or 'hypothetical' . . . .'" *Id.* (citations omitted).  Unless the plaintiff has suffered such an injury he is without standing to invoke the jurisdiction of a federal court.  *See Sierra Club v. Morton*, 405 U.S. 727, 735 (1972).

The United States Supreme Court has recognized that, under certain circumstances, a provision regulating speech may be challenged as overly broad even by one whose own First Amendment rights are not violated.  *See Secy. of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984).  This is "because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression" *Id.* at 956-57.  Yet a federal court allows litigation to proceed under this variant of "third-party standing" with "hesitation" and "only as a last resort."  *New York v. Ferber*, 458 U.S. 747, 769 (1982).  And even this standing to make an overbreadth challenge requires the plaintiff to have suffered an injury in fact as a result of the regulation.  *See Joseph H. Munson Co.*, 467 U.S. at 958.

Ripeness is another doctrine that has developed in elaboration of Article III's case-or-controversy requirement.  *See Allen*, 468 U.S. at 750 (discussing the several "doctrines that cluster around Article III") (quoting *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1178-1179 (D.C. Cir. 1983)).  The doctrine of ripeness requires that, to fall within the federal jurisdiction defined by Article

III, the harm asserted by the plaintiff must have "matured suffi-ciently to warrant judicial intervention." *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975). "A court should dismiss a case for lack of 'ripeness' when the case is abstract or hypothetical." *Monk v. Huston*, 340 F.3d 279, 282 (5th Cir. 2003) (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586 (5th Cir. 1987)). The doctrines of ripeness and standing are related and often overlap, in that both require the plaintiff to have suffered an injury or to be faced with an imminent injury in order to present a justiciable controversy. *See Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545 (5th Cir. 2008) (quoting *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 225 (2nd Cir. 2006)).

The doctrine of mootness also serves to limit the federal judiciary's jurisdiction to actual cases and controversies. Where the doctrine of standing requires the plaintiff to have a personal interest in the suit by having suffered an injury in fact, the doctrine of mootness requires that the controversy created by the injury exist throughout the litigation. *See U.S. Parole Comm'n v Geraghty*, 445 U.S. 388, 397 (1980). "Generally, any set of circum-stances that eliminates actual controversy after the commencement of a lawsuit renders that action moot," which eliminates federal jurisdiction over the case. *Ctr. for Individual Freedom v. Car-mouche*, 449 F.3d 655, 661 (5th Cir. 2006); *see Ex parte Baez*, 177 U.S. 378, 390 (1900) (stating that when the case is moot "there is no subject matter on which the judgment of the court's order can

operate"). But "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case." *City of Mesquite v. Aladdin's Castle*, 455 U.S. 283, 289 n.10 (1982). Rather, "[a] case might become moot if subsequent events [make] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.*

Beyond the constraints imposed by Article III, other considerations counsel that this Court be circumspect in exercising its jurisdiction to address issues of constitutional import. For instance, the doctrine of standing also embodies certain prudential considerations of judicial self-restraint. Federal courts are to be cautious in addressing cases that call for an interpretation of the Constitution. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (noting the standing doctrine's "command to guard jealously and exercise rarely our power to make constitutional pronouncements"). Even in cases that fall within the federal jurisdiction announced in Article III, a federal court may use prudential considerations to decline to pass on a constitutional question "unless adjudication of the constitutional issues is necessary." *Id.* And, more precisely, "'the determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board,' rather than with the federal courts." *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 267 (1988) (internal citation omitted) (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986)). That is, "[c]ourts do not and cannot intervene in the resolution of conflicts which

arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968).

With the foregoing principles in mind, the Court has reviewed the pleadings, the evidence presented at trial, and the arguments in the briefing and concludes that many of the challenges to TCC's rules and regulations brought by Smith and Schwertz are not justiciable.

### 1.   Ripeness and Standing

Smith and Schwertz seek to challenge the portion of the student handbook entitled "General Rule on Signs." This provision states, in relevant part, that "[s]ubject to the rules in this Section VI [of the student handbook], a College District person or organization may display a sign by holding or carrying it, by displaying it at a table, or by posting it on a bulletin board or other designated location." (Pl.'s Tr. Ex.7, p.14.) A "sign" according to the handbook is "any method of displaying a visual message to others except that transfer of a copy of the message is distribution of literature and not a sign." (*Id.*) The student handbook defines "College District person or organization" as "includ[ing] academic and administrative units, registered student and faculty/staff organizations, and individual students and faculty/staff members." (*Id.* at p.8.)

Smith and Schwertz challenge other provisions dealing with the use of signs, particularly by visitors or those who do not fall

within the handbook's definition of College District person or organization.  A provision of the handbook, entitled "Hand-Held Signs," states that "[s]tudents and faculty/staff members may display a sign on campus by holding or carrying it by hand or otherwise attaching it to their person." (Pl.'s Tr. Ex. 7, p.14.) The handbook also contains a section entitled "Campus Visitor Rules" which lists certain acts that TCC considers a violation of school policy and state or local law. (*Id.* at 2.)  Among the enumerated acts is a visitor's "[p]osting or carrying unauthorized signs, posters, leaflets, etc." (*Id.*)  According to Smith and Schwertz, under these provisions visitors, or non-students, cannot use signs as a form of speech on TCC campuses.

The challenges made by Smith and Schwertz to the bulk of these provisions regulating the use of signs falls outside of this Court's jurisdiction most manifestly due to the fact that there was no evidence at trial that either Smith or Schwertz had been denied the ability to use a sign or desired to use a sign as part of their protests.  Of course, to challenge a provision as being unconstitutional as applied, the plaintiffs must show that the provision was, in fact, applied to them and deprived them of their First Amendment rights.  "To prove standing to raise a First Amendment facial challenge, a plaintiff must produce evidence of an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the regulation on speech]. Specifically, plaintiffs must demonstrate a serious interest in acting contrary to a [regulation on speech]." *Miss. State Demo-*

11

*cratic Party v. Barbour*, 529 F.3d at 545.  Smith testified that the protest conducted in November 2009 did not involve poster-style signs, that his "vision" of SCCC protests on TCC's campuses did not include such signs, and that he was unaware if signs were used as part of SCCC protests on other college campuses.  (Tr. Trans. Vol. I at 134.)

Both Smith and Schwertz testified that they passed out leaflets as part of the November 2009 protest.  (*Id.* at 136, 144.)  Smith and Schwertz also wore shirts bearing the SCCC logo--a mortarboard atop a revolver--during the November 2009 protest.  (*Id.* at 113, 141.)  T-shirts depicting a logo and leaflets might arguably fall within the handbook's broad definition of "sign"--"any method of displaying a visual message to others."  (Pl.'s Tr. Ex.7, p.14.)  Leaflets, however, would seem to be excluded from the definition of "sign" based on the definition's clause "except[ing] transfer of a copy of [a] message [a]s distribution of literature and not a sign." (*Id.*)  Moreover, the handbook's "General Rule on Signs" speaks of signs in terms of "posting"; leaflets and shirts are not posted.

More fundamentally, even to the extent that Smith and Schwertz's use of leaflets and shirts might fall within the defini- tion of signs, they still lack standing to challenge the foregoing provisions and have not presented a ripe controversy regarding the provisions.  Whatever medium--be it poster-style signs, leaflets, or shirts--falls within the handbook's definition of "signs," unquestionably, the foregoing provisions allow students to make use of signs on campus.  The handbook's "General Rule on Signs" and

section on hand-held signs both allow students to display signs on campus and the section on "Campus Visitor Rules" limits the use of signs by visitors, not students. As students, Smith and Schwertz have not suffered, and are not imminently likely to suffer, an injury in fact due to the student handbook's provisions prohibiting non-students' use of signs on TCC campuses.

Smith argues that he is not a student and, therefore, has standing to challenge the provisions prohibiting the use of signs by visitors on TCC campuses. But the student handbook defines "student," in relevant part, as "a person who . . . has been en-rolled at the College District in a prior semester or summer session and is eligible to continue enrollment in the semester or summer session that immediately follows." (Pl.'s Tr. Ex.7, p.8.) Smith acknowledges that he was attending TCC in the fall semester of 2009. (Tr. Trans. Vol. I at 108.) And although Smith testified that he would not be attending TCC in the spring semester of 2010 but would, instead, be attending the University of Texas at Arlington, Smith presented no evidence that he was ineligible to enroll at TCC for the spring semester. (*Id.* at 117.) Indeed, Smith's testimony was that he has received nothing from TCC to indicate that he was ineligible for the spring semester (*id.* at 117). Dr. William Lace, TCC's interim vice-chancellor for administrative and community services, testified that Smith would be considered a student through the end of the spring semester. (Tr. Trans. Vol. II at 131-32.) Thus, Smith will be a student for purposes of TCC's provisions regulating speech in April 2010, when SCCC plans to hold its next

demonstration in which Smith intends to participate.  (Tr. Trans. Vol. I at 115.)  Hence, Smith is without standing to challenge the provisions regulating visitors' use of signs and has not presented a ripe controversy regarding such provisions.

This conclusion applies to several of the other challenges to TCC's rules and regulations made by Smith and Schwertz.  Smith and Schwertz challenge other portions of the handbook's "Campus Visitor Rules."  Specifically, Smith and Schwertz challenge the part of those rules that state that a visitor will be considered to have violated college policy or state and local law by "[d]isrupting classes or campus activities;" "[d]isturbing the peace (inside or outside of buildings);" "[a]ttempting to organize or promote any unauthorized organization or activities;" and "[v]iolating any TCC regulation."  (Pl.'s Tr. Ex. 7, p.2-3.)

Smith and Schwertz also challenge the section of the student handbook entitled "General Rule on Public Assemblies," which states that "College District persons and organizations may publicly assemble on campus in any place where, at the time of the assembly, the person assembling are permitted to be.  This right to assemble is subject to the rules in this Section VI."  (Pl.'s Tr. Ex. 7, p. 20.)  The student handbook defines "College District person or organization" as "includ[ing] academic and administrative units, registered student and faculty/staff organizations, and individual students and faculty/staff members . . . ." (*Id.* at p.8.)  Smith and Schwertz argue that in light of the limiting definition of "College District person," the permissive language of the general rule on

14

public assemblies implicitly prohibits non-students from participat-
ing in on-campus assemblies.

Additionally, Smith and Schwertz challenge the portion of the
student handbook under the title "Guest Speakers" and subtitled
"Location and Form of Presentations" that states "[a] guest speaker
may present a speech or performance or lead a discussion of speci-
fied duration, at a time announced in advance, in a fixed indoor
location or in a fixed outdoor location approved by the vice presi-
dent for student development services. A guest speaker may distrib-
ute literature only immediately before, during, and immediately
after the normal course of his or her speech, presentation, or
performance, and only to persons in attendance. Only literature
that complies with this Section VI [of the student handbook] may be
distributed." The provision goes on to provide that a guest speaker
may not "distribute literature to persons who have not chosen to
attend the speech, performance, or discussion, or help staff a table
or exhibit set up under this Section VI." (Pl.'s Tr. Ex. 7, p.21.)
Smith and Schwertz argue that this provision prevents guest speakers
from engaging in speech on campus without prior approval and
impermissibly limits a guest speaker's ability to disseminate
literature.

But again, both Smith and Schwertz are considered students––not
guests or visitors––under TCC's handbook. Neither has shown that
his speech has or will be restricted under the campus-visitor rules,
the general rule on public assemblies, or the foregoing limitations
on guest speakers. Thus, Smith and Schwertz have no standing to

15

challenge these provisions and have not presented a ripe controversy regarding them.

Similarly, Smith and Schwertz cannot challenge the portion of the student handbook under the title "Guest Speakers" and subtitled "Who May Present," that states "[r]egistered students, faculty/staff members, registered student or faculty/staff organizations, and academic and administrative units may present guest speakers on College District property.   In the case of registered student organizations, advance permission from the vice president for student development services is required.   Individuals may not present a guest speaker." (Pl.'s Tr. Ex. 7, p.20.)   Smith and Schwertz challenge these provisions on three grounds: they impermissibly limit the ability of guests to speak on campus; they impermissibly limit the ability of students to present a guest speaker; and they impermissibly limit the ability of a registered student organization to present a guest speaker.

As has been established, both Smith and Schwertz are students under TCC's rules and regulations.  Consequently, to the extent that the guest-speaker provisions limit speech on campus by guest speak-ers, neither Smith nor Schwertz is personally subject to such limitation.   There was no evidence at trial that either Smith or Schwertz attempted to present a guest speaker as part of past demonstrations or intends to present one during the April 2010 demonstration.   Thus, even assuming a student might have a free-speech right to present a guest speaker to further the student's views, Smith and Schwertz cannot challenge TCC's rules and regula-

16

tions restricting speech by visitors and guest speakers. As for the limitation on an organization's ability to present a guest speaker, the guest-speaker provisions address registered student organizations. SCCC is not a registered student organization.

Some of the portions of the handbook and TCC's rules and regulations of which Smith and Schwertz complain are simply not restraints on speech and, therefore, Smith and Schwertz's attempt to challenge them does not give rise to a justiciable controversy. The portion of the student handbook entitled "Other Offenses" states "[t]he College may initiate disciplinary proceedings against a student who" engages in certain enumerated forms of conduct, including a "violat[ion of] College policies or regulations regarding parking, registration of student organizations, use of College facilities, or the time, place, and manner of public expression." (Pl.'s Tr. Ex.7, p.6.) Smith and Schwertz have shown no imminent injury as a direct consequence of this provision. This provision only infringes Smith and Schwertz's First Amendment rights to the extent that the referenced policies or regulations impermissibly restrict their freedom of speech or association. The referenced policies and regulations can be analyzed in their own right.

Smith and Schwertz also challenge the section of the PRM entitled "General Guidelines" that states "[f]acilities and equipment at the College District are generally available for use by internal and external groups on a priority basis with the following conditions: (1) The event must be related to the College District mission and philosophy [and] (2) All events other than those that

17

are part of regularly scheduled classes must have reserved the
facility and/or equipment through the campus president or designee."
(Pl.'s Tr. Ex. 3, p.1.)  Smith and Schwertz complain that this
section vests unfettered discretion in the president or his designee
in deciding whether to grant a reservation of equipment or a facil-
ity because the provision contains no guidelines to direct or inform
the decision.  But the provision does not even grant the president
or his designee the authority to deny a reservation; it merely says
that a reservation must be made.  On its face, this provision is
merely a statement of policy that notice to TCC is required to use
its facilities or equipment.

     The policies and regulations manual (again, "the PRM") also
contains a section entitled "Permissible Activity" that states "[i]n
compliance with reasonable and nondiscriminatory regulations of the
College District, students, faculty, or staff or their registered
or non-registered organizations, may petition, post signs, distrib-
ute literature, set up tables and exhibits, []or peaceably demon-
strate on property owned or controlled by the College District,
provided that the posting of signs and setting up of tables and
exhibits may require prior authorization." (Pl.'s Tr. Ex. 3, p.2.)
Again, Smith and Schwertz argue that this provision grants--
unconstitutionally--unfettered discretion because it requires
students to seek authorization to engage in speech activities but
does not provide guidance for the TCC official charged with granting
such authorization.  But again, the provision says only that autho-
rization *may* be required.  It does not address the power of any TCC

official to deny a student the ability to engage in speech activity and, indeed, does of itself require authorization.

Smith and Schwertz argued during trial that TCC had an unwritten policy to "deny freedom of expression on campus when the expression raises an expectation of disruption or the potential for fear in an observer, even if the observer's perception is mistaken." (Pl.'s Tr. Am., doc. #77, at 1.).  Further, Smith and Schwertz insist that TCC's position that they could not wear empty holsters on campus and could not pass out leaflets anywhere except the free-speech zone was not based on one of the provisions of the PRM or of the student handbook, but was based on TCC's "predisposition to disagree with the message the plaintiffs are communicating that there should be concealed weapons on campus." (Tr. Trans. Vol. I, p.176.)  But during his testimony, Lace thoroughly explained his understanding of the rationale behind TCC's position and stated that it was based on the school's rules and regulations on disruptive activity, which are discussed in more detail below.  And Smith and Schwertz presented no evidence of an unwritten policy.

Moreover, although the current provision on disruptive behavior is part of the revisions that occurred after this lawsuit was filed, Plaintiffs concede in their amended complaint there was a provision on disruptive behavior, entitled "Student Conduct Disruptions" in the "FLBH(LEGAL)" portion of the PRM.  It appears that TCC based its decision to disallow empty holsters in April and November 2009 on this provision.  And Plaintiffs have presented no evidence that TCC's administration singled out the content of their speech or

19

their viewpoint on the subject for regulation.

The Court hastens to clarify that its conclusions on standing and ripeness are not an indication that none of the foregoing provisions challenged by Smith and Schwertz are constitutionally suspect.  To the contrary, some seem quite broad and potentially susceptible to challenge for overbreadth or vagueness.  But Smith and Schwertz have not shown how they have been injured by these provisions.  Thus, they have not presented a ripe controversy that they have standing to litigate.


            2.  Mootness

In their trial brief, TCC and Hadley argue that the challenges to the free-speech zone and the permit system have been mooted by the revisions to the handbook and the PRM that did away with these limitations.   Smith and Schwertz respond that the defendants' voluntary cessation of the allegedly unconstitutional conduct does not moot their claims.  While this is the general rule, *see City of Mesquite*, 455 U.S. at 289 n.10, when the allegedly illegal conduct is not likely to recur, the plaintiff's claim might become moot. *See id.; see also Roberts v. Haragan*, 346 F. Supp. 2d 853, 858 n.5 (N.D. Tex. 2004) (concluding that student's facial challenge to university's regulations on speech were mooted because university adopted new policy and there was no indication the university intended to revert to the previous, allegedly unconstitutional policy).

Smith and Schwertz argue that the new policies were adopted in

a manner that did not comport with Texas law governing community colleges and that did not comport with TCC's own regulations.  Smith and Schwertz do not limit this argument to a response to the defendants' mootness argument.  Instead, they assert TCC's failure to comply with applicable state law and TCC regulations in revising the handbook and the PRM as a basis for this Court to invalidate the revised provisions.

Texas law, according to Smith and Schwertz, does not allow a community college to regulate the conduct of non-students.  But as discussed above, Smith and Schwertz do not have standing to challenge TCC rules and regulations on the conduct of non-students, and have not presented a ripe controversy regarding such regulations.

As for TCC's authority to regulate the conduct of students, Texas Education Code section 51.202 authorizes "[t]he *governing board of [a] public junior college*[ to] promulgate rules and regulations for the safety and welfare of students, employees, and property . . . ."  Tex. Educ. Code. § 51.202 (emphasis added).  Smith and Schwertz point out that, under the Texas Education Code, the board of a community college "shall act and proceed by and through resolutions or orders adopted or passed *by the board* and the affirmative vote of a majority of all members of the board shall be required to adopt or pass a resolution or order . . . ."  *Id*. at § 130.082(d) (emphasis added).  Moreover, it is "[t]he *governing board of an institution of higher education* [that] shall provide the policy direction for each institution of higher education under its management and control."  *Id.* at § 51.352(b) (emphasis added).

21

Smith and Schwertz insist that, despite these provisions, TCC's board did not promulgate the purported revisions to its regulations. Nor did the board promulgate certain portions of the student handbook, which Smith and Schwertz argue TCC enforces as regulations. Instead, they allege, in the portion of the PRM entitled "FLAA (LOCAL)," TCC improperly attempts to delegate to administrators who write the handbook, such as the chancellor and vice chancellor, the authority to "stipulate" what is prohibited disruptive expressive conduct. This is improper, Smith and Schwertz contend, because it allows administrators to add to the substance of the TCC's board-promulgated regulations in the PRM. Citing various provisions of Texas law, Smith and Schwertz argue that administrators do not have the authority to promulgate regulations or policies. *See* Tex. Educ. Code § 51.210 (granting officers of a community college the authority "to enforce rules and regulations promulgated by the board); *see also* Tex. Educ. Code § 130.084 (governing board of community college is subject to state law regulating independent school districts); *id.* at § 11.201 (defining authority of superintendent as "chief executive officer" of school district). Similarly, Smith and Schwertz point to TCC regulations that seem to limit the authority of the chancellor to enforcing regulations and policies established by the board. Despite the state law cited by Smith and Schwertz and the constraints imposed by TCC's own regulations, Lace assisted in re-writing the student handbook, including the portions that Smith and Schwertz argue impermissibly function as regulations, and Hadley approved the revisions to the handbook, as well as revisions to the

22

PRM, which embodies the school's regulations.    And, Smith and Schwertz insist, even Hadley has not approved some of the revisions to the handbook's provisions on speech activities.

But Smith and Schwertz do not explain how far they would have the Court proceed with this argument or its effect on their case as a whole.  Smith and Schwertz complain that the most recent revisions to the handbook and the PRM were not promulgated in accordance with Texas law or TCC's own regulations.  Assuming this is true, it is unclear where this leaves Smith and Schwertz in challenging TCC's rules and regulations on speech.  There was evidence and argument from TCC during the bench trial that TCC has always delegated regulation-making authority, as well as the authority to revise the student handbook, to the chancellor.  As TCC's attorney explained during the trial, "if the plaintiff[s] want[] to take the position that the student handbook is not valid because it's not appropriately passed, then the one [that was in place before this lawsuit] wasn't appropriately passed . . . . [Thus, there has never been] a handbook that had restrictions [on speech] in place."  (Tr. Trans. Vol. I, p.91.)  Smith and Schwertz do not address whether, in the event that the Court declares the most recent revisions to the PRM and handbook null or void, they would persist in their challenges to the version of the PRM and handbook that existed when they filed this suit.  Nor have they addressed whether they *could* persist with such challenges given that, as argued by TCC, if the most recent revisions are null or void the prior version is equally ineffective. To take Smith and Schwertz's argument this far would seem to call

into question whether a justiciable controversy exists in this case at all in that, if the effect of Smith and Schwertz's argument is that there are no valid rules or regulations of speech for TCC to enforce, there could be no controversy regarding their enforcement.

The case and the controversy, however, lies not in the validity of the rules and regulations but in TCC's intention to enforce its rules and regulations to limit speech and expressive conduct on TCC's campuses, regardless of the legitimacy of their adoption, and in the fact that Smith and Schwertz have manifested a serious interest in acting contrary to those rules by engaging in empty-holster protests. *See Miss. State Democratic Party v. Barbour*, 529 F.3d at 545 (discussing ripeness and standing to make facial challenge to regulation restricting speech). Indeed, TCC's rules and regulations have effectively been applied to Smith and Schwertz to prevent them from engaging in the empty-holster protest they intended for April and Nonmember 2009 and the protest they intend to conduct in April 2010. *See Citizen Action Fund v. City of Morgan City*, 154 F.3d 211, 216 (5th Cir. 1998) *withdrawn on other grounds by* 172 F.3d 923 (concluding that threatened enforcement of a regulation restricting speech can chill speech and thus, gives rise to an as-applied challenge to the regulation); *see also Houston Chronicle Publ. Co. v. City of League City,* 488 F.3d 613, 618-19 (5th Cir. 2007) (concluding a defendant had standing to make as-applied and overbreadth challenge to a city ordinance based on the city's threat to enforce the ordinance); *754 Orange Ave., Inc. v. West Haven*, 761 F.2d 105, 111 (2d Cir. 1985) (concluding a city's threat to enforce

24

a zoning ordinance was an unconstitutional prior restraint).  And
the validity of current and prior versions of the handbook and the
PRM aside, according to the evidence at trial, TCC's administration
intends to enforce the most recent revisions of the handbook and PRM
from the point of their adoption onward.  Any determination by TCC
that Smith and Schwertz's intended April 2010 protest is in viola-
tion of school rules and regulations will be made under the most
recent version of these documents.

Ultimately, Smith and Schwertz's complaint must be that regard-
less of the process by which the rules and regulations were adopted,
the adoption process culminated in rules and regulations that
violate the First Amendment.  Otherwise, their complaint is simply
that the attempted adoption by TCC of revised rules and regulations
was contrary to state law and TCC's internal procedures.  Such a
controversy, lacking any issue of federal law, would not be proper
for determination by this Court.  But Smith and Schwertz have
clearly raised First Amendment issues, and these issues can be
addressed without addressing the validity, under state law and TCC's
internal procedures, of the revised handbook and PRM.  If Smith and
Schwertz wish to have the alleged violations of state law decided,
they may seek such relief in state court.

Beyond the questions raised by Smith and Schwertz regarding the
promulgation of the most recent versions of the PRM and student
handbook, there is no indication that TCC intends to revert to the
rules and regulations in place when this suit was filed.  Conse-
quently, Smith and Schwertz's challenge to the provisions imposing

25

a permit system on students seeking to engage in expressive conduct on TCC's campuses and limiting students to a free-speech zone are moot.

B.   The Merits

With the foregoing analysis of the doctrines of standing, ripeness, and mootness, it is clear that a large part of the case initially presented by Smith and Schwertz is not justiciable.  Their ability to speak on campus was constrained to a free-speech zone and their access to that zone was restricted by a permit system.  Both of these aspects of TCC's rules and regulations have been abrogated. Even so, Smith and Schwertz were previously denied the ability to wear empty holsters on campus under a provision regulating disruptive activity by students.  A similar provision exists even under the revised handbook.  Hadley and Lace testified that this provision would continue to be applied to prevent SCCC members from wearing empty holsters on campus, as well as from passing out leaflets in classrooms and adjacent hallways.  (Tr. Trans. Vol. II., p.74, 131.) TCC has also adopted a provision in the student handbook that, to paraphrase, prohibits students from engaging in speech on campus that is cosponsored by an non-student or off-campus organization. (Pl.'s Tr. Ex., p.12.)   Smith and Schwertz testified that, in affiliation with SCCC, they intend to engage in an empty-holster protest on TCC's northeast campus in April 2010 and that, as part of this protest, they each wish to wear an empty holster on campus, including into classroom, and to speak to students and handout leaflets as they walk from class to class.  Thus, the constitution-

26

ality of TCC's attempt to restrict this activity remains at issue and is justiciable.

### 1.   Forum Analysis and Level of Scrutiny

As the United States Court of Appeals for the Fifth Circuit has explained, a college campus is government-owned property and "[t]he standards by which regulations of speech on government property must be evaluated 'differ depending on the character of the property at issue.'" *Justice for All v. Faulkner*, 410 F.3d 760, 766 (5th Cir. 2005) (quoting *Perry Ed. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983)).  That is, the plaintiff's right to engage in speech and the standard applied in reviewing restrictions on that right depend on the nature of the forum.  *See Perry Ed. Ass'n*, 460 U.S. at 44-46.  "Broadly speaking, there are three types of forum for purposes of First Amendment scrutiny: traditional, nonpublic, and designated." *Justice for All*, 410 F.3d at 765.  Typically, at least for the students of a college or university, the school's campus is a designated public forum.  *See id.; see also Roberts,* 346 F. Supp. 2d at 861-73; *see Pro-Life Cougars v. Univ. of Houston*, 259 F. Supp. 2d 575, 582 (S.D. Tex. 2003).

The category of designated public forum is further divided into true designated forums and limited forums.  *See id.*  To determine whether a designated public forum is a true designated forum or a limited forum, a court must perform a two-factor analysis.  *See id.* at 766.  A court must "look to '(1) the government's intent with respect to the forum, and (2) the nature of the forum and its

compatibility with the speech at issue.'" *Id.* (quoting *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 n. 10 (5th Cir. 2001)).  This analysis does not force upon the Court an "all-or-nothing proposition" in which the Court must "choose between the polar extremes of treating an entire university campus as a forum designated for all types of speech by all speakers, or, alternatively, as a limited forum where any reasonable restriction on speech must be upheld." *Id.* Rather, the Court may evaluate as a forum a natural subdivision of the campus, such as generally accessible open areas or classrooms.  *See id.* at 767 & n.8 (noting that the "limited/designated dichotomy" need not be applied at the campus-wide level and that, in *Justice for All*, the forum at issue was the "outdoor open areas of the University's campus, accessible to the students generally"); *see also Bowman v. White*, 444 F.3d 967, 976 (8th Cir. 2006) ("A modern university contains a variety of fora.").

Smith and Schwertz's complaints deal with two distinct forums: the generally accessible outdoor open areas on TCC's campuses that resemble traditional public forums, and the classrooms and adjacent hallways.  TCC's intent with regard to both forums can be found in the section of the PRM entitled "GF (Regulation)" and the subsection entitled "Category of Facility."  (Pl.'s Tr. Ex. 3, p.1.)  This provision, which is almost identical to the University of Texas Regents Rule addressed by the Fifth Circuit in *Justice for All*, states "[t]he property or buildings owned or controlled by the College District are not open for assembly, speech, or other activities as are the public streets, sidewalks, and parks.  The responsi-

bility of the College District to operate and maintain an effective and efficient system of an institution of higher education requires that time, place, and manner of assembly, speech, and other activities on the grounds and in the campuses be regulated." (Pl.'s Tr. Ex. 3, p.1.) TCC concedes that the effect of this and other of its policies and regulations is, at a minimum, to create for its students a designated public forum in its campus's outdoor areas. (Br. On Closing Argument at 10.) Thus, regulations of student speech in these areas is subject to strict scrutiny. *See Justice for All*, 410 F.3d at 765.

The forum-classification issue with regard to the outdoor areas on TCC's campuses is one of the instances in which Smith and Schwertz rely on their argument that TCC's latest revisions to the student handbook and the PRM were not properly promulgated. According to Smith and Schwertz, "Category of Facility" is one of the regulations impermissibly added to the PRM. And with "Category of Facility" set aside as void, the Court should address the open areas on campus, including streets and sidewalks, as traditional public forums. But for reasons already discussed, the Court need not address this argument. Smith and Schwertz seek to have the these areas on campus analyzed as traditional public forums in support of their challenge to TCC's provisions limiting the ability of non-students to engage in expressive activity on campus. Neither Smith nor Schwertz has standing to make such a challenge.

As for classrooms and adjacent hallways, generally speaking, these areas are considered nonpublic forums. *See Bowman*, 444 F.3d

29

at 977; *see also Linnemeir v. Bd. of Trs.*, 260 F.3d 757, 760 (7th Cir. 2001) ("Classrooms are not public forums . . . ."); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1285 (10th Cir. 2004) (concluding, under *Hazelwood School District* and *Perry Education Association* that a university classroom is a non-public forum); *Bishop v. Aronov*, 926 F.2d 1066, 1071 (11th Cir. 1991) (stating that although a university *may* open its classrooms for other purposes, they are generally dedicated to the university's teaching purposes); *also cf. M.A.L. v. Kinsland*, 543 F.3d 841, 847 (6th Cir. 2008) (concluding hallways of a public school are a nonpublic forum) (citing *Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1543 (7th Cir. 1996)).  And Smith and Schwertz have not pointed to any provision of TCC's rules and regulations or any practice by the school regarding the use of classrooms and hallways that would indicate that these areas have been opened up for speech activities.  *See Widmar v. Vincent*, 454 U.S. 263, 267 (1981) (noting that a university, through its policy and practice, had "created a forum generally open for use by student groups" in its facilities); *see also Axson-Flynn*, 356 F.3d at 1285 (concluding that because there was no indication that "school authorities have 'by policy or by practice' opened [the classroom]" for use by "student organizations" the classrooms were not public forums) (quoting *Perry Ed. Ass'n*, 460 U.S. at 46 n.7) (alteration in *Axon-Flynn*); *cf. Hazelwood Sch. Dist.*, 484 U.S. at 267 (stating that public-school facilities are not designated forums for student speech unless opened up for such use "by policy or practice").

Several times in their amended complaint, Smith and Schwertz

allege that TCC's restrictions on student speech are content based and, specifically, that the TCC administration seeks to suppress Smith and Schwertz's message because it advocates for the right to carry concealed handguns on campus; a viewpoint that TCC's administration allegedly disagrees with.  But Smith and Schwertz presented no evidence that TCC's rules and regulations applied differently to them than to other speakers with other messages or viewpoints.  To the contrary, just as it had apparently done with other student speakers, after being informed of the proposed April 2009 and November 2009 protests, TCC was prepared to allow Smith and Schwertz to engage in speech activities in the free-speech zone.  And TCC's decision to prohibit Smith and Schwertz from wearing empty holsters was based on its administration's good-faith interpretation of the school's rules and regulations on disruptive behavior.  Thus, under the law in the Fifth Circuit, TCC's viewpoint-neutral restriction on speech in the classroom will be upheld so long as it furthers an important or substantial governmental interest--and that interest is unrelated to the suppression of student expression--and if the incidental restrictions on First Amendment activities are no more than is necessary to facilitate that interest.  *See Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437, 441-43 (5th Cir. 2001) (discussing the various categories of regulations of student speech and the standards applied to each).

2.   The Classrooms and Hallways

According to the testimony of vice chancellor Lace, TCC's revised policies will be applied to deny them the ability, as part of their intended protest in April 2010, to wear holsters on campus and to pass out leaflets in class and in the hallways.  Specifically, Lace testified that wearing holsters and passing out leaflets in classroom would be considered a prohibited disruptive activity under the revised student handbook.  The portion of the student handbook entitled "Disruptive Activities" states "[t]he College may initiate disciplinary action against any student involved in disruptive activities.  Any activity that interrupts scheduled activities or the process of education may be classified as disruptive." (Pl.'s Tr. Ex. 7, p.5.)  The provision goes on to state that, among other things, "[c]onducting an activity which causes College officials to interrupt their scheduled duties to intervene, supervise, or observe activities in the interest of maintaining order at the College" will be considered disruptive activity.  (*Id.*)  During the trial, Smith and Schwertz identified this as one of the provisions that they sought to challenge.  As noted above, prior to this lawsuit TCC maintained a similar provision in the FLBH(LEGAL) portion of the PRM.

Unfortunately, Smith and Schwertz do not provide an analysis of the constitutionality of this provision in either their trial brief or written closing arguments.  Instead, their focus is on the portions of TCC's policies and regulations limiting speech on campus by non-students.  Even so, Smith and Schwertz alleged that enforce-

32

ment of this provision to deny them the ability to wear empty holsters in the classroom was unreasonable, and that this provision as written is overly broad and vests unfettered discretion in administrators to assess what amounts to a disruption.

TCC and Hadley argue that preventing students from wearing empty holsters in the classroom and hallways serves the important government interest of ensuring student safety and providing for a disruption-free environment conducive to learning.  TCC and Hadley argue that preventing students from wearing holsters indoors, as well as preventing handing out leaflets in classrooms and hallways, prevents disturbances and disruptions to the school's educational goals.  Of course, these are important interests.  "A university's mission is education . . . ." *Widmar v. Vincent*, 454 U.S. at 268 n.5.  Thus, the federal judiciary "has never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Id.* Maintaining student safety on campus and order generally are substantial inter-ests as well.  *See Bd. of Trs. v. Fox*, 492 U.S. 469, 475 (1989) (stating that student safety was a substantial interest justifying a university's restriction on commercial speech); *see also Healy*, 408 U.S. at 180 (noting the "acknowledged need for order" on cam-pus).  And TCC's interest in ensuring the safety of its students and order on its campuses to facilitate its educational mission is unrelated to speech.

Hence, the issue becomes whether the disruptive activities provision furthers these interests and does so in a way that imposes

no more incidental restrictions on speech than is necessary. Prohibiting students from passing out leaflets inside classrooms and adjacent hallways furthers TCC's interest in carrying out its educational mission. It is axiomatic that a student cannot disrupt the school's efforts in the classroom to instruct students nor undermine his classmates' right to learn in order to spread his personal message. *See Burnside v. Byars*, 363 F.2d 744, 748 (5th Cir. 1966) (characterizing speechmaking and the scattering of leaflets in class as among "those activities which inherently distract students and break down the regimentation of the class-room"); *cf. Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511-31 (1969) ("[C]onduct by the student, in class or out of it [that] materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech). And Smith and Schwertz have not shown how the disruptive activities provision, applied to prevent leafletting in classes and adjacent hallways, imposes any greater incidental restriction on speech than is necessary to facilitate in-class work. Nor is any apparent.

But Smith and Schwertz's desire to wear empty holsters in classrooms is another matter. As the United States Supreme Court has explained, its precedents "leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, the vigilant protection of constitutional freedoms is nowhere more vital than in the commu-

34

nity of American schools." *Healy*, 408 U.S. at 180 (internal quotations omitted).   The Fifth Circuit has further explained that "[a]lthough school officials may prohibit speech based on a forecast that the prohibited speech will lead to a material disruption, the proscription cannot be based on the officials' mere expectation that the speech will cause such a disruption."   *A M v. Cash*, 585 F.3d 214, 2009 U.S. App. LEXIS 22361, at *14 (5th Cir. 2009).

While this statement came in the context of the Fifth Circuit's elaborating on *Tinker*'s heightened-review standard, rather than the standard announced in *Canady* for viewpoint-neutral regulations of personal expression that happen to occur on campus, the observation seems equally applicable to the scenario addressed in *Canady*.   Even a viewpoint-neutral restriction on speech must further the claimed important interest that purportedly justifies the restriction.   *See Canady*, 240 F.3d at 443; *also cf. Illusions - Dallas Private Club, Inc. v. Steen*, 482 F.3d 299, 312 (5th Cir. 2007) (noting, under the test announced in *United States v. O'Brien*, 391 U.S. 367 (1968), that there must be a substantial government interest *and* that the restriction on speech "must further that interest" and that both issues must be supported by evidence).

In this case, TCC insists that it is authorized to prohibit certain symbolic speech activity--the wearing of an empty holster--pursuant to a rule prohibiting disruptive behavior with the rationale being that such activity could result in a disruption of TCC's educational and disciplinary goals.   This rationale rests on the opinion of TCC administration that the presence of an empty holster

35

on campus, and particularly in the classroom, could engender fear in other students and make it easier for someone to carry a firearm onto campus. Thus, the test of the constitutionality of the disruptive-activities provision becomes whether the provision actually serves to prevent these events or TCC's apprehension of such events is "mere expectation."

Admittedly, even under *Tinker*'s heightened standard, the burden of school officials to justify their regulations "is not a "difficult [one]." *Cash*, 2009 U.S. App. LEXIS 22361, at *15 (citing *Shanley v. Northeast Indep. Sch. Dist.*, 462 F.2d 960, 970 (5th Cir. 1972). School officials' "'decisions will govern' if they are 'within the range where reasonable minds will differ.'" *Id.* (quoting *Butts v. Dallas Indep. Sch. Dist.*, 436 F.2d 728, 732 (5th Cir. 1971). Nevertheless, under *Tinker*'s standard, "[o]fficials must base their decisions 'on fact, not intuition.'" *Id.* at *14-*15 (quoting *Butts*, 436 F.2d at 731.) A school's administration "cannot rely on *ipse dixit* to demonstrate . . . interference with school discipline," *Shanley*, 462 F.2d at 970, but must instead make "some inquiry, and establish[] substantial fact, to buttress the determination." *Butts*, 436 F.2d at 732. Even under the less-exacting standard announced in *Canady*, the fact that the regulation on speech does, in fact, further the school's claimed interest must be supported by evidence, not supposition. *See Canady*, 240 F.3d at 443-44 (upholding school's requirement that students wear uniforms when school's claimed interest was discipline and improved test scores and the school provided statistics showing that discipline problems

decreased and test scores improved after the uniform requirement was imposed).

But all TCC offered at trial to justify its decision to disallow empty-holsters in classrooms was the speculation of its officials. At trial, Lace and Hadley testified that the concern of TCC's administration, with regard to the wearing of holsters in the classroom, was that a student may mistake an empty holster as containing a gun and react with fear or panic and cause a disturbance to classroom activities. Also, according to Hadley and Lace, a student might see an empty holster and believe a gun is nearby; for instance, in the backpack of the student wearing the empty holster. In either case, the student seeing the empty holster might report the matter to the police. Campus police might then respond to the classroom and enter to determine whether a gun was actually present. TCC's chief of police Frank Buchanan testified that if a gun were reported on a TCC campus all officers present on that campus would likely be sent to investigate. Buchanan stated that the responding officers would undertake tactical maneuvers to enter the building where the gun is reported to be, account for the students and faculty present, to position themselves to verify whether a gun was actually present, and, if necessary, confiscate the gun. Hadley opined that, in light of the large size of TCC's campuses, such a response would leave the campus police unable to respond to other calls. Hadley further testified that TCC feared that someone could use an empty-holster protest as a cover to wear a holster actually containing a gun.

The overarching theme of TCC's justification is that disruption to classroom activities could be caused by either students' immediate reaction to the empty holsters or in the police response to reports of firearms on campus caused by the empty holsters. As for the potential for increased reports of firearms on campus, Buchanan acknowledged during his testimony that he had no objective basis for believing that additional reports of firearms on campus would be caused by empty-holster protests. (Tr. Trans. Vol. III, p.116.) Even to the extent such a conclusion might be based on Buchanan's experience as a law enforcement officer or common sense, this is not evidence on which a decision to deny free speech may be based. *See A.M.*, 2009 U.S. App. LEXIS 22361, at *14 (stating officials may not base their decision on "intuition"); *also cf. Steen*, 482 F.3d at 315 (where state bore the burden of proving link between speech activity and the purported negative effects of that speech used to justify regulation, common-sense link was not enough).

And Rather than buttress Lace and Hadley's concerns that empty holsters would cause other students to fear for their safety, Buchanan's concern seemed to be that the debate over the right to carry concealed handguns on campus might get too heated, noting that an empty-holster protest would involve "different people with different thoughts . . . who might not agree with the empty-holster protest" (Tr. Trans., Vol. III, p.114.) Buchanan also seemed concerned with the protest's logistics, stating that he was concerned with "where it was going to be held [and keeping] the students and everybody . . . safe." (*Id.*) But Buchanan's concerns

about the reaction of the student body to Smith and Schwertz's message is not a sufficient basis to suppress their symbolic speech. "The existence of a hostile audience, standing alone, has never been sufficient to sustain a denial of or punishment for the exercise of First Amendment rights." *Beckerman v. Tupelo*, 664 F.2d 502, 510 (former 5th Cir. 1981) (discussing the "hecklers' veto"); *also cf. Cohen v. California*, 403 U.S. 15, 22 (1971) (concluding conviction under state law banning disruption of the peace by offensive conduct violated the First Amendment because, inter alia, there was no showing that the defendant's speech would actually cause a violent reaction by viewers). And although, with regard to Buchanan's logistical concerns, maintaining order and student safety are important interests, the issue presently under analysis is whether TCC policies and enforcement of such policies actually furthers those interests. Buchanan offered no elaboration or factual support for his logistical concerns.

Buchanan's testimony did allude to other concerns about student safety. Buchanan apparently received an email from a colleague discussing threats written on bathroom stalls at the University of Oakland and at St. Xavier University. (Def.'s Tr. Ex. 24.) There was a similar incident at TCC in April 2008. A student scrawled on the wall of a bathroom stall at the northeast campus that "there will be a shooting here on April 19." (Def.'s Tr. Ex. 10; Tr. Trans. Vol. III, p. 56-60) Buchanan testified that he made his concerns based on these events known to TCC's administration.

But the email was not received by Buchanan until April 14 and

the incident at TCC's northeast campus was not reported until April 4. (Def.'s Tr. Exs. 10, 24.)  Hadley and TCC's administration had made their decision to deny Poulos and other SCCC members the ability to wear empty holsters by April 2.  (Tr. Trans. Vol. III, p.56-60; Def.'s Tr. Ex. 19.)  Thus, TCC had made the decision that its policies and regulations would not allow for the wearing of empty holsters on campus by the time this information was available.

In any event, there was no evidence linking empty-holster protests to an increased likelihood of a shooting on campus.  Hadley testified that she feared that "some student [would] show up on campus with a gun in the holster."  (Tr. Trans. Vol. III, p.30.) But if anything, that would be the exact opposite effect of the empty-holster protest.  SCCC members wear empty holsters to high-light the fact that they are *not* armed.  And there is simply no logical force behind such a fear; if a person wished to bring a firearm onto campus undetected, he likely would not wear it in a holster, exposed for all to see.

Buchanan also stated in his testimony that April is the month that many notable acts of violence took place, particularly with regard to school campuses.  As Smith acknowledged in his testimony, April is the month in which the shootings at Columbine High School and Virginia Tech occurred, as well as the month in which the Alfred P. Murrah Federal Building in Oklahoma City was bombed.  But neither Buchanan, nor Hadley or Lace, explain how this coincidence makes it any more likely that students wearing empty holsters as part of a protest will cause a disruption.

40

Aside from the writing on the bathroom wall, TCC presented evidence of only one other incident that purportedly justifies its decision.  In April 2008, a TCC instructor reported to TCC police that a student had been engaging in threatening activity.  (Def.'s Tr. Ex. 11)  According to the instructor's report, a student had drawn a skull and dagger on the classroom chalkboard, had spoken of bringing weapons to class, had threatened classmates, and had re-enacted the Virginia Tech shootings during a class discussion of school shootings. (*Id.*)  But again, other than showing there was some incident vaguely related to the issue on which Smith and Schwertz wanted to speak--the prohibition against firearms on college campuses--creating some general sense of fear or apprehen-sion, TCC fails to explain how this incident bears on the request to wear *empty* holsters or how this isolated threat of violence could be exacerbated by an empty-holster protest.

This is where TCC's argument fails.  TCC's decision to prohibit students from protesting the status of the law and school policy on concealed firearms by wearing empty holsters to class rests on an "undifferentiated fear or apprehension of disturbance." *See Tinker*, 393 U.S. at 508.  This, of course, "is not enough to overcome the right to freedom of expression." *Id.*  "Much nondisruptive speech --such as the wearing of a T-shirt or button that contains a politi-cal message. . . is still protected speech even in a nonpublic forum." *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987).  Controversial symbolic speech, with the potential to evoke a strong and possibly violent emotional response from those

41

who see it has time and again been held protected, even in nonpublic forums, including the classroom. *See Tinker*, 393 U.S. at 508-09 (concluding that school's prohibition against students' wearing black armbands in protest of the Vietnam war violated the First Amendment); *Cohen v. Cal.*, 403 U.S. 18-26 (concluding jacket, worn in a state courthouse, with the message "Fuck the Draft" in protest of the Vietnam war was protected); *Burnside v. Byars*, 363 F.2d 744, 748 (5th Cir. 1966) (concluding that students' wearing "freedom buttons," meant to draw attention to race relations and encourage black citizens to exercise their civil rights, did not disrupt class and was therefore protected speech).  As noted above, whether under the standard announced in *Canady* or the heightened standard announced in *Tinker*, where, as here, the potential for disruption is the justification for the restriction on speech, the constitutionality of the restriction turns on whether it actually serves to prevent disruption.  When restrictions on potentially disruptive speech have been upheld, it has been based on evidence that the nature of the speech and the environment in which it is to occur are such that a disturbance is more than a mere expectation.

The treatment of a student's right to display the confederate flag is instructive.  For instance, in *A.M. v. Cash*, the Fifth Circuit dealt with students who wished to wear purses to school that prominently displayed the confederate flag.  The court noted that the confederate flag has, at least in some circumstances, taken on a meaning of racism and intolerance.  *Cash*, 2009 U.S. App. LEXIS 22361, at *15.  The court then cited extensive evidence that there

42

had been a great deal of racial tension and hostilities on the campus of the school that promulgated the challenged regulations. *See id.* at *16 (noting ongoing racial hostility, racially hostile vandalism and epithets, discipline issues involving the use of racial epithets, racially motivated confrontations, a simulated lynching, and use of the confederate flag to taunt black students in upholding school's prohibition on displaying confederate flag). In light of this evidence, the court concluded that the school had a sufficient factual basis to forecast that further display of the confederate flag would lead to disruption. *See id.* Other courts to address the display of the confederate flag have similarly cited evidence of a factual basis upon which school administrators could forecast that a disruption would occur if the flag were displayed. *See Scott v. Sch. Bd.*, 324 F.3d 1246, 1249 (11th Cir. 2003) (concluding a public school could ban display of the confederate flag because of evidence of racial tension and evidence of racially-motivated fights on campus); *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1366-1367 (10th Cir. 2000) (concluding that school's ban on display of the confederate flag was proper under *Tinker* because of a series of incidents, some of which involved the flag, including hostile confrontations between black and white students and at least one fight); *Melton v. Young*, 465 F.2d 1332, 1335 (6th Cir. 1972) (concluding that a ban on the display of the confederate flag was permissible in light of racially motivated confrontations and disruptions).

TCC's administration, on the other hand, opines, without

43

supporting evidence, that students *might* be placed in fear by the *potential* that a handgun is present upon seeing an *empty* holster and that such a student *might* report the incident to police whose investigation *might* disrupt classwork.  They further speculate that a student *might* use an empty-holster protest as a cover for actually bringing a handgun on campus.  Thus, TCC and Hadley have failed to show that the disruptive-activities provision of the student hand-book furthers the important interests on which they rely to justify it.  Consequently, both the current provision on disruptive activi-ties and its predecessor previously found in the FLBH(LEGAL) portion of the PRM, as applied to prevent Smith and Schwertz from wearing empty holsters to class as part of their protests in April 2009, November 2009, and April 2010, violate the First Amendment.  *See Citizen Action Fund*, 154 F.3d at 216 (concluding threatened enforce-ment of regulation restricting speech gives rise to as applied challenge).

Smith and Schwertz also challenge the provision as overly broad.  Smith and Schwertz have shown that TCC intends to invoke this provision as a basis for prohibiting them from wearing empty holsters in class as part of their protest in April 2010.  It might be argued that from this showing it can be extrapolated that Smith and Schwertz have made the broader showing that TCC's administration understands this provision to allow it to prohibit expressive activity based on the mere expectation of a disruption.

And admittedly, nothing in the provision requires administra-tors, as part of their decision to prohibit expressive activity as

44

disruptive, to base their decision on facts determined as a result of an inquiry into the activity's potential for disruption. But the doctrine of constitutional avoidance counsels against this Court's making a pronouncement regarding the overbreadth of a regulation on speech when the regulation can be construed so as to avoid facial unconstitutionality. *See Hersh v. United States*, 553 F.3d 743, 753 (5th Cir. 2008). "Facial challenges to the constitutionality of statutes should be granted 'sparingly; and only as a last resort,' so as-applied challenges are preferred." *Id.* at 762-63 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601 (1973)). As the Fifth Circuit has explained regarding the availability of a facial challenge:

> "According to our First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech." Such facial challenges can succeed only when this overbreadth is substantial in relation to the statute's legitimate reach. There must be a "significant imbalance between the protected speech the statute should not punish and the unprotected speech it legitimately reaches." The party challenging the statute must demonstrate "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the [c]ourt before a statute will be struck down as facially overbroad."

*Id.* at 762 (quoting *United States v. Williams*, 128 S. Ct. 1830, 1838 (2008) and *Shackelford v. Shirley*, 948 F.2d 935, 940 (5th Cir. 1991)).

On its face, the disruptive-activities provision authorizes TCC's administration to discipline students "involved in disruptive activities," with "disruptive activity" defined as activity that "interrupts scheduled activities or the process of education." (Pl.'s Tr. Ex. 7, p.5.) School officials clearly have the authority

45

to discipline students and to prohibit activities that are actually disruptive or that they believe will cause a disruption after inquiry and development of substantial evidence in support of such belief. *See Canady*, 240 F.3d at 443-44 (concluding that school's requirement that students wear uniforms did not violate students' First Amendment rights because of evidence that the requirement reduced discipline problems); *also cf. Tinker*, 393 U.S. at 513 (stating that conduct by a student that causes disruption, disorder, or infringes the rights of others is not protected by the First Amendment); *Cash*, 2009 U.S. App. LEXIS 22361, at *14-15 (stating a school may prohibit student speech based on the speech's potential for disruption after inquiry into the potential for disruption and development of substantial supporting evidence). Smith and Schwertz have not shown that there is a realistic danger that the disruptive-activities provision significantly compromises protected speech beyond their particular circumstances. *Cf. Hersh*, 553 F.3d at 762. Rather, they have shown that the provision, as interpreted and applied to them by TCC's administration, violated their First Amendment rights. Thus, the Court concludes that the provision is unconstitutional as applied to Smith and Schwertz but is not fa-cially overbroad.


### 3.   The Outdoor Open Areas on Campus

TCC has conceded that the public-forum-type areas on its campuses, such as streets, sidewalks, and outdoor common areas (such as lawns and plazas) are designated public forums for students. As

46

such, rules or regulations restricting speech in these areas must withstand strict scrutiny. *See Justice for All*, 410 F.3d at 766-67. "In order to survive First Amendment strict scrutiny, a content neutral restriction on speech must be narrowly tailored to a significant state interest and must leave open ample alternative channels of communication." *Id*. at 769. Maintaining student safety and order on campus to facilitate the school's educational efforts is a significant interest. But the disruptive-activities provision does not serve these significant interests.

The above discussion under the standard announced in *Canady* regarding TCC's use of the disruptive-activities provision to prevent Smith and Schwertz from wearing empty holsters in classrooms applies with even greater force to TCC's prohibition on empty holsters in public-forum type areas, which is reviewed under the heightened strict-scrutiny standard. Colleges and universities are, of course, authorized to adopt rules to ensure discipline and prevent disruptions to foster the learning process. But TCC has not shown how its prohibition of empty-holster protests based on the mere undifferentiated apprehension of a disturbance furthers its interest in ensuring student safety and maintaining an environment conducive to learning. *Cf. id.* at 768 n.10 (noting that, under strict scrutiny, a time, place, and manner regulation of speech must be "narrowly tailored to *serve* a significant government interest") (emphasis added). To the contrary, Smith, Schwertz, and other members of SCCC participated in an empty-holster protest in the common areas of TCC's northeast campus in November 2009 after this

Court issued a temporary restraining order requiring TCC to allow them to do so.  TCC presented no evidence of any disruption caused by the protest.  To the contrary, according to Smith and Schwertz's testimony, they each wore an empty holster, spoke to a number of students on the issue of concealed firearms on campus, and handed out leaflets as they walked outside from class to class throughout the week of November 9.  Smith and Schwertz's protest was peaceful and even those with whom they spoke that disagreed with SCCC's views seemed to appreciate the fact that Smith and Schwertz were exercising their right to speech.  (Tr. Trans., Vol. I, p.114, 145.)  As a result, the Court concludes that the disruptive-activities provision is unconstitutional as applied to prevent SCCC members from wearing, as part of their protest, empty holsters in public-forum-type areas.

Smith and Schwertz also challenge the student handbook's provision entitled "Cosponsorship," which provides:

(a) Neither registered student, faculty/staff organizations, nor individual students or faculty/staff members, may cosponsor any event on campus with an off-campus person or organization.  Only academic or administrative units with authority delegated from the Chancellor of the College District may cosponsor events with an off-campus person or organization.

(b) An event is a prohibited cosponsorship if an individual or student or faculty/staff organization:

    (1) depends on an off-campus person or organization for planning, staffing, or management of the event; or

    (2) advertises the event as cosponsored by an off-campus person or organization; or

    (3) operates the event as an agent of, of for the

48

> benefit of, an off-campus person or organiza-
> tion, except for solicitation of charitable
> contributions; or
>
> (4)  reserves a room or space for the use of an off-
>      campus person or organization; or
>
> (5)  engages in any other behavior that persuades
>      the vice president for student development
>      services that an off-campus person or organiza-
>      tion is in fact responsible for the event, in
>      full or in substantial part.

(Pl.'s Tr. Ex.7, p.12.)   Smith and Schwertz complain that the

cosponsorship provision impermissibly prohibits students from

engaging in speech activities on campus when that speech is cospon-

sored by an off-campus person or organization.   Smith and Schwertz

have made no claim that either they or SCCC has sought to reserve

a classroom under this provision, and, therefore, the Court will not

address the constitutionality of this provision to prohibit any of

Smith and Schwertz's intended speech in classrooms or similar

facilities.   And TCC has not relied on this provision in concluding

that empty holsters are not allowed on campus and in particular the

classrooms.   But Smith and Schwertz have standing to challenge this

provision regarding the use of public-forum type areas because SCCC

is an off-campus organization, (Tr. Trans., Vol. II, p.51), and both

Smith and Schwertz intend to participate in an empty-holster protest

cosponsored by SCCC in April 2010 in which they will wear empty

holsters, and speak to students and pass out literature in the

public-forum type areas of TCC's northeast campus.

The provision gives its own statement of the interest it is

meant to serve.   "The purpose of this rule is to preserve the

limited space on campus for the use of students and faculty/staff

members, and the rule will be interpreted to serve that purpose."
(Id.)  In the abstract, preservation of college facilities for their
intended use is a significant interest.  A school, "like the private
owner of property, may legally preserve the property under its
control for the use to which it is dedicated."  *Lamb's Chapel v.
Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 390 (1993).  But
TCC has not shown that its interest in preserving campus facilities
for use by students and faculty and staff members is, in reality,
so significant as to warrant a regulation restricting speech.
Indeed, when asked, Lace admitted that he was "not aware" of any
pressure as to space on campus that would necessitate such a re-
striction.  (Tr. Trans., Vol. II, p.55.)

And the cosponsorship provision is not narrowly tailored to
serve this interest.  A regulation on speech "is narrowly tailored
if it targets and eliminates no more than the exact source of the
'evil' it seeks to remedy."  *See Frisby v. Schultz*, 487 U.S. 474,
485 (1988).  Conversely, "[a] regulation is not 'narrowly tai-
lored' . . . where . . . 'a substantial portion of the burden on
speech does not serve to advance [the government's content-neutral]
goals.'"  *Simon & Schuster, Inc. v. Members of the New York State
Crime Victims Bd.*, 502 U.S. 105, 122 (1991).  Rather than target and
eliminate the evil that TCC claims justifies the cosponsorship
provision--preserving limited space on campus for use by students,
faculty, and staff--the provision broadly prohibits *any* speech by
students that involves an off-campus organization in almost any
conceivable way.  Indeed, with its subpart (b)(5), which allows the

50

vice president to prohibit student speech based on any behavior that persuades the vice president that an off-campus organization is responsible for the event in substantial part, the Court cannot imagine how the provision could have been written more broadly.

The sweeping breadth of the cosponsorship provision becomes even more apparent when reference is made to the handbook's definition of event. An "event," as defined by the handbook and used in the cosponsorship provision, includes but is not limited to the use of exhibits, signs, or tables; distribution of literature; and assembly. (Pl.'s Tr. Ex.7, p.8.) When read in light of this definition, the cosponsorship provision prohibits students from the most basic forms of expressive activity--distribution of literature, use of signs, and even assembly--based on no more than the fact that the expression might depend on an off-campus organization for planning or management, is advertised as cosponsored by an off-campus organization, or otherwise substantially involves an off-campus organization. (*Id.* at p.12, "Cosponsorship" provision, subparts (b)(1), (2), and (5).) In fact, TCC would allow itself to deprive students of these most basic forms of speech, in areas that it concedes are designated public forums for students, based on as little as the fact that the speech will inure to the benefit of an off-campus person or organization or the fact that the speech will involve reservation of a room or other space on campus. (*Id.* subparts (b)(3) and (4).) Thus, even when all of the activity that occurs on campus involves only students, TCC could apply this provision to prevent those students from engaging in speech activi-

ties merely based on the happenstance that off-campus persons were involved with, or would benefit from, the speech. This, of course would not serve TCC's claimed purpose of reserving for students, faculty, and staff use of campus facilities.

And even beyond this, there are narrower methods of ensuring the availability of campus facilities for students, faculty, and staff, than a blanket prohibition on student speech that involves off-campus persons or organizations. To the extent that students begin to compete for particular spaces on campus in which to engage in expressive activity, the college could implement a reservation system. Or if cosponsored speech events results in crowding and the exclusion of students from certain parts of campus, the college could impose reasonable restrictions on the areas in which large events may be held, on the presence of non-students on campus for speech activities, or on the duration of speech events. But prohibiting outright student speech based on its mere affiliation with an off-campus person or organization is too broad.

Nor does it leave open ample alternative channels of communication. The provision prohibits any speech that involves or benefits an off-campus person or organization. This effectively encompasses all speech. Under TCC's present rules, neither the College Republicans nor College Democrats could address the upcoming campaign for governor of Texas on campus. After all, such speech would work to the benefit of a candidate (an off-campus person) and would likely involve the support of the candidates' party (an off-campus organization). Any on-campus speech by students regarding religious views

will likely involve the support off-campus persons (members of the religion) and an off-campus organization (the religion's organized body) and will necessarily work to the benefit of both.  The same is true of any issue that has achieved an appreciable level of social importance and, thus, is likely to be the subject of speech. It is telling that at no point during the trial did TCC even attempt to provide an example of a topic that is likely to be debated by students that would not involve or benefit some off-campus person or group.

It is the fact that members of the public have a stake in how certain issues are resolved and that the interest of some is not consistent with, or even adverse to, the interest of others, that make such issues likely topics for public debate.  Any speech on such issues will necessarily work to benefit off-campus persons whose views align with that of the speaking students.  And it is the very nature of free speech that like-minded people will assemble together to more forcefully express their viewpoint on an issue. Issues that are important enough to impel a student to speak are the issues that most likely have resulted in the formation of an organiza-tion whose purpose is to express its members' views.  But a TCC student who reaches out to such an organization for assistance in communicating his views, which is in accordance with the very nature of free speech, would be prohibited from speaking on TCC's campus under the cosponsorship provision.  Rather than recognizing that its campus "is peculiarly the marketplace of ideas," *Healy*, 408 U.S. at 180, and nurturing the free speech of its students, TCC has largely

deprived students of any organized assistance in expressing their views or, indeed, in learning the very process of self expression. The cosponsorship provision, effectively, prohibits TCC's students from speaking on campus on issues of any social importance and, therefore, cannot stand. *See Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984) (noting regulation of speech may be invalidated under strict scrutiny if the alterative "modes of communication are inadequate").

And unlike the disruptive-activities provision, the sweeping breadth of the cosponsorship provision causes the Court to conclude that it is overly broad and, consequently, unconstitutional on its face. Smith and Schwertz have done more than present hypothetical situations in which the provision will impact protected speech. *Cf. Hersh*, 553 F.3d at 762. To the contrary, it is difficult to conceive of any speech by a student on an issue of social importance that would not involve some affiliation of an off-campus group or person or work to such person or group's benefit and, therefore, be subject to prohibition under the cosponsorship provision. Hence, the provision "prohibits a substantial amount of protected speech." *Id*. Relatedly, TCC has not pointed out any legitimate applications of the provision. Thus, even granting that TCC has an important interest in ensuring its students, faculty, and staff have access to its campus and facilities, any legitimate applications of the cosponsorship provision to serve this end are significantly outweighed by the substantial number of unconstitutional applications of the provision.

III.  Conclusion

     With the foregoing, the Court concludes that many of the
challenges mounted by Smith and Schwertz to TCC's rules and regula-
tions on speech are not justiciable.  However, the disruptive-
activities provision, as applied to student SCCC members to prevent
them from wearing empty holsters on campus or in the classroom,
violates such students' First Amendment right to free speech.
Additionally, the cosponsorship provision is overly broad and thus,
violates the First Amendment on its face.

     Accordingly, it is hereby ORDERED that Erma Johnson Hadley and
Tarrant County College District, its officials, employees, and
agents, be and they are hereby PERMANENTLY ENJOINED from prohibiting
Clayton Smith, John Schwertz Jr., and any other Tarrant County
College District student from wearing empty holsters in TCC's
classrooms, on the TCC campuses' streets and sidewalks, and in the
TCC campuses' outdoor common areas, such as lawns and plazas.
Additionally, it is hereby ORDERED that Erma Johnson Hadley and
Tarrant County College District, its officials, employees, and
agents, be and they are hereby PERMANENTLY ENJOINED from enforcing
the student handbook's provision entitled "Cosponsorship" to pro-
hibit student speech on the campus streets or sidewalks, or in the
campus common areas, such as lawns and plazas.  Any other declara-
tory or injunctive relief sought by Smith and Schwertz not specifi-
cally granted is DENIED.

     Smith and Schwertz also request attorney's fees.  Smith and
Schwertz must submit a brief, no later than fourteen days after the

date of the entry of this order, setting forth the legal authority by which the Court may award attorneys' fees in this case, establishing (with relevant supporting evidence) the amount of fees requested, and discussing the reasonableness of the amount of fees requested under the "lodestar" analysis and the factors discussed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-719 (5th Cir. 1974). *See* Fed. R. Civ. P. 54(d)(2) (discussing handling of a request for attorneys' fees). A response brief and a reply brief on the issue of attorneys' fees may be submitted according to the local rules.

SIGNED March 15, 2010.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE